El Juez Presidente Señor Hernández Denton
emitió la opinión del Tribunal.
En esta ocasión tenemos el deber ineludible de evaluar la validez de la reforma al Sistema de Retiro de la Judica-tura aprobada mediante la Ley Núm. 162-2013. El análisis de esa legislación —la cual podría afectar a todos los jueces en funciones, los retirados y los que se nombren en un fu-turo— requiere un ejercicio ponderado y reflexivo de este Tribunal. Aunque esta controversia nos impone la tarea delicada de pasar juicio sobre nuestro sistema de retiro, se trata de un evento histórico que requiere que cumplamos con nuestro deber primordial de proteger celosamente la Constitución, como juramos hacer el día que asumimos nuestros cargos. Además, tenemos la oportunidad de re- *320 afirmar los postulados más básicos de nuestro sistema de-mocrático de gobierno. En esencia, el asunto que hoy con-sideramos nos obliga a examinar minuciosamente las fronteras de la doctrina de separación de poderes y la in-dependencia judicial en nuestro ordenamiento jurídico.
Examinadas íntegramente las disposiciones de la ley, junto con la normativa constitucional aplicable, validamos la reforma más significativa que se ha hecho al Sistema de Retiro de la Judicatura. Ello significa que los jueces nom-brados por primera vez a partir del 1 de julio de 2014 par-ticiparán del Programa Híbrido que establece la Ley Núm. 162-2013 y los jueces nombrados por primera vez entre el 24 de diciembre de 2013 y el 30 de junio de 2014 tendrán como tope máximo de su pensión el 60% del sueldo más alto devengado como juez, según dispone la reforma legislada. Por otra parte, basado en el mandato constitu-cional, se mantendrá inalterado el derecho que tienen los jueces nombrados en o antes del 23 de diciembre de 2013 sobre sus pensiones de retiro. De este modo, armonizamos la ley con los postulados de nuestra Constitución y los prin-cipios que encarnan nuestro sistema republicano de gobierno.
I
A. Proyecto de la Cámara 1595 original
El 19 de diciembre de 2013 comenzó una sesión extraor-dinaria convocada por el gobernador, Hon. Alejandro Gar-cía Padilla, para atender, entre otros asuntos, una reforma al Sistema de Retiro de la Judicatura del Estado Libre Aso-ciado de Puerto Rico. A esa fecha, el proyecto presentado por la administración, Proyecto de la Cámara 1595 (P. de la C. 1595), contenía una reforma que aplicaría únicamente a los jueces que fueran nombrados por primera vez a partir del 1 de julio de 2014. Específicamente, el título del pro-yecto expresaba que el propósito de la medida era
*321 [...] efectuar cambios prospectivos en el esquema legal aplica-ble al Sistema de Retiro de la Judicatura y establecer un Pro-grama Híbrido de beneficio definido y contribución definida que habrá de resultar aplicable a futuros jueces del Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico, con el fin de brindarle mayor estabilidad fiscal al Sistema de Retiro de la Judicatura de Puerto Rico y disminuir las defi-ciencias actuariales que actualmente afronta; y para otros fines relacionados. (Enfasis suplido).(1)
Consecuentemente, la Exposición de Motivos establecía lo siguiente:
[E]sta Asamblea Legislativa reconoce que cualquier reforma a las pensiones del sistema de retiro de los jueces y juezas debe ser de naturaleza prospectiva para aquellas personas que sean nombradas por primera vez a un cargo como juez o jueza en el Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico a partir de la fecha de efectividad de esta ley. De esta forma, se evita que la Judicatura esté sujeta a repre-salias, presiones y a situaciones de indebida intervención, con-trarias a los principios de independencia judicial y separación de poderes. (Énfasis suplido).(2)
Aquí se expusieron ampliamente las implicaciones de carácter constitucional que debían considerarse a la hora de reformar el Sistema de Retiro de la Judicatura. A esos efectos, la Exposición de Motivos del proyecto original es-tablecía que:
El sistema de retiro para los jueces que forman parte del Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico es de estirpe constitucional, pues encuentra su base en la Sección 10 del Artículo V de la Constitución. Esta sección dispone que: “la Asamblea Legislativa establecerá un sistema de retiro para los jueces, retiro que será obligatorio cuando hubieren cumplido setenta años de edad”. Art. V, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1. La Asamblea Constituyente plasmó de esta manera una de las garantías a los principios de independencia judicial y separación de poderes. Gar *322 cía Martínez v. Gobernador. 109 D.P.R. 294, 297-298 (1979). El Presidente de la Comisión de la Rama Judicial de la Asamblea Constituyente, el delegado Ernesto Ramos Antonini, ex-presó que “[l]a independencia del poder judicial, se garantiza ... mediante [distintas] características que contiene el proyecto];] [entre éstas, la que] establece que la Legislatura de Puerto Rico aprobará un sistema de retiro para los jueces. Esto tiende a dar un sentido de estabilidad a los jueces en el desempeño de sus funciones, tan delicadas en nuestra sociedad”. Diario de Sesiones de la Convención Constituyente de Puerto Rico 452—453 (1961).
El principio de independencia judicial encuentra continuidad de propósito en las cláusulas de no reducción de salarios de las Secciones 10 y 11 del Artículo VI de la Constitución. Véase Diario de Sesiones, supra, pág. 453; La Nueva Constitución de Puerto Rico, Escuela de Administración Pública, Universidad de Puerto Rico 499 (1954); Negrón Soto v. Gobernador. 110 D.P.R. 664, 666 (1981). La Sección 10 dispone que: “ninguna ley prorrogará el término de un funcionario público ni disminuirá su sueldo o emolumentos después de su elección o nombramiento”. Art. VI, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1. Por su parte, la Sección 11 establece que: “los sueldos del Gobernador, de los Secretarios de Gobierno, de los miem-bros de la Asamblea Legislativa, del Contralor y de los Jueces se fijarán por ley especial y, con excepción del sueldo de los miembros de la Asamblea Legislativa, no podrán ser disminuidos durante el término para el cual fueron electos o nombrados”. Art. VI, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1. Véase, además, José Julián Álvarez González, La Asamblea Legislativa de Puerto Rico y las Pensiones de los Jueces del Tribunal Supremo: Reseña de un Conflicto con la Independencia Judicial, 56 Rev. Jur. U.P.R. 265, 298 (1987). El propósito común de proteger la independencia judicial que tienen las citadas cláusulas y la Sección 10 del Art. V de la Constitución sobre el retiro de la judicatura sugiere que la protección contra la reducción de salarios pudiese ser de aplicación a los benefi-cios de los sistemas de retiro. (Corchetes en el original).(3)
Según expresó el Gobernador al someter el proyecto, distinto a otras reformas de retiro para servidores públi-cos, la reforma del Sistema de Retiro de la Judicatura fue estructurada para que aplicara prospectivamente pues, “por tratarse de una rama gubernamental, la Constitución *323 impide que se les deduzcan las compensaciones a los jueces que están en su puesto”.(4)
Mediante el proyecto remitido por el Ejecutivo, los jueces nombrados a partir del 1 de julio de 2014 tendrían, en comparación con los jueces nombrados antes de esa fecha: un aumento de 8% a 12% en la aportación de cada participante al Sistema de Retiro; un aumento de 60 a 65 años en la edad de retiro, y un aumento de 8 a 12 años de servicio como juez, mínimo requerido para poder acogerse al retiro. Además, se sustituía la base utilizada anteriormente para calcular la pensión, a saber, el sueldo más alto devengado como juez, por el promedio del sueldo devengado durante los últimos 5 años. Asimismo, los jueces nombrados por primera vez a partir de esa fecha cotizarían bajo un Pro-grama Híbrido creado mediante la misma medida legislativa. Al acogerse al retiro, esos participantes recibirían una anualidad vitalicia que incluía un componente de beneficio definido y otro de contribución definida. (5)
Para esos jueces, el Programa Híbrido sustituía la posi- *324 bilidad de recibir una pensión del 75% del sueldo más alto devengado como juez. La reforma también eliminaba el bono de verano, el bono de medicamentos y el aguinaldo de navidad. Por último, se cerraban las transferencias prove-nientes de otros sistemas de retiro, por lo que al calcular la pensión no se daría crédito por otros servicios prestados al Gobierno en cualquier otra capacidad que no fuera la de juez.
Es decir, que el proyecto remitido por el Ejecutivo no impactaba a los jueces en funciones ni a los ya retirados, pero modificaba sustancialmente las condiciones de retiro para los jueces nombrados por primera vez a partir del 1 de julio de 2014. Precisamente, el proyecto disponía que la ley entraría en vigor el 1 de julio de 2014 y aplicaría a "aquellas personas que a partir de tal fecha sean nombradas por pri-mera vez a un cargo como juez del Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico”.(6) De hecho, incluía una cláusula derogatoria para que no se afectaran los derechos adquiridos y los beneficios otorgados mediante otras leyes y reglamentos.(7)
El viernes 20 de diciembre de 2013 se celebró una vista pública sobre esta medida. A esta vista comparecieron la Asociación Puertorriqueña de la Judicatura (Asociación de la Judicatura), la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura (Administra-ción de los Sistemas de Retiro), el Banco Gubernamental de Fomento, el Departamento de Justicia, la Oficina de Administración de los Tribunales y la Oficina de Gerencia y Presupuesto, quienes presentaron sus respectivos comentarios. En síntesis, las seis ponencias favorecían el proyecto por su aplicación a los jueces nombrados en el futuro. Entendieron que, de esta forma, se cumplía con el *325 mandato constitucional de que cualquier reforma a este sistema tenía que ser prospectiva.
La Asociación de la Judicatura expresó que
[...] esta acción que se toma por el gobierno para atender la situación fiscal de los sistemas de retiro públicos, se hace a nuestro entender presentando estos proyectos para modificar de forma prospectiva el sistema de retiro de la Judicatura, demuestra que estamos en una sociedad de ley y orden donde los representantes de nuestro pueblo, elegidos por éstos para administrar el gobierno, conocen y respetan la Constitución. (Enfasis en el original).(8)
De igual forma, la Administración de los Sistemas de Retiro concluyó que la medida “representa un ejercicio en la dirección correcta para reformar el Sistema de Retiro de la Judicatura, toda vez que modifica los beneficios de los futuros participantes del Sistema”.(9)
Por su parte, el Banco Gubernamental de Fomento indicó que “no se opone a que la Asamblea Legislativa ausculte cambios adicionales a dicho Sistema que sean actuarialmente recomendables y que caigan dentro de los límites constitucionales detallados en la Exposición de Motivos”.(10) Igualmente, el Departamento de Justicia brindó su anuencia al proyecto y expuso que, “en vista de que esta medida legislativa se atiene a la normativa antes expuesta al disponer su vigencia a partir del 1 de julio de 2014, sin afectar el retiro garantizado constitucionalmente a los actuales jueces y ex jueces, el Departamento de Jus-ticia no presenta objeción legal alguna”.(11) En su Ponencia, el Departamento de Justicia destacó lo siguiente:
[...] cuando nos encontramos ante proyectos de ley como el *326 presente, debemos tener en cuenta que los contornos legales de las pensiones judiciales están sujetos a consideraciones constitucionales ulteriores. En específico, lo establecido en las citadas cláusulas constitucionales de no reducción de salarios del Artículo VI, Secciones 10 y 11 de la Constitución, y los principios de independencia judicial al amparo del Artículo V, Sección 10 de la Constitución.(12)
Además, fundamentándose en un informe de la American Bar Association, sostuvo que “la falta de autosuficiencia e independencia del Sistema de Retiro de la Judicatura, a diferencia de los otros sistemas de retiro público, no parece ser, de por sí, criterio suficiente para validar una reducción de beneficios”.(13)
Por su parte, la Oficina de Administración de los Tribunales (OAT) respaldó las propuestas presentadas, las cuales eliminaban y reducían los beneficios a los futuros jueces y aumentaban su aportación al sistema. La OAT entendió que de esta forma se atendía el asunto legislado dentro del marco constitucional vigente.(14)
Por otro lado, la Oficina de Gerencia y Presupuesto también presentó su endoso al Proyecto y concluyó que “esta Reforma aporta a la meta de obtener una estabilidad económica en nuestro país, y se demuestra solidaridad con las *327 medidas de control fiscal y manejo de las finanzas que se han estado tomando”.(15)
A raíz de esto, la Comisión de Asuntos Laborales y Sistemas de Retiro del Servicio Público y la Comisión de Hacienda y Presupuesto de la Cámara de Representantes rindieron al día siguiente un informe positivo sobre la medida junto con unas enmiendas incluidas en el entrillado electrónico.(16) Estas Comisiones mantuvieron el carácter prospectivo de la reforma, pero propusieron que se eliminara el bono de verano, el bono de medicamentos y el aguinaldo de Navidad para todos los participantes del sistema.
B. Proyecto de la Cámara 1595 enmendado en la Cámara de Representantes
Así las cosas, el sábado 21 de diciembre de 2013 la Cá-mara de Representantes de Puerto Rico consideró el P. de la C. 1595, le introdujo unas enmiendas a viva voz y lo aprobó. Según surge del Diario de Sesiones, el análisis so-bre las enmiendas fue el siguiente:
SR. HERNÁNDEZ LÓPEZ: Señor Presidente, que se aprue-ben dichas enmiendas.
SR. PRESIDENTE (PERELLÓ BORRÁS): Los que estén a favor servirán decir que sí. En contra no. Aprobado.
Quiero destacar el voto en contra del compañero Torres Yordán y Várela Fernández.
SR. HERNÁNDEZ LÓPEZ: Señor Presidente.
SR. PRESIDENTE (PERELLÓ BORRÁS): Que se apruebe la medida según enmendada, señor Portavoz.
SR. HERNÁNDEZ LÓPEZ: Señor Presidente, vamos a solici-tar la aprobación de la medida según ha sido enmendada.
*328 SR. PRESIDENTE (PERELLÓ BORRÁS): Los que estén a favor servirán decir que sí. En contra no. Aprobado.
Ya dejamos claro a los Representantes que están en contra de la enmienda.
SR. HERNÁNDEZ LÓPEZ: Hay enmiendas en el título, soli-citamos sean aprobadas dichas enmiendas.
SR. PRESIDENTE (PERELLÓ BORRÁS): Si no hay objeción, se aprueban las enmiendas al título.(17)
Las enmiendas introducidas alteraron considerablemente las pensiones de los jueces nombrados por primera vez “en o antes del 30 de junio de 2014”.(18) También se modificó la fecha de vigencia de la ley para hacerla efectiva inmediatamente después de su aprobación. Particular-mente, la Cámara de Representantes añadió las siguientes modificaciones: estableció una pensión por retiro que no excederá del 60% del sueldo más alto devengado como juez para toda persona que sea nombrada en o antes del 30 de junio de 2014; aumentó la aportación individual de 8% a 10% para estos últimos; incluyó una ventana para que los participantes que cualifiquen para solicitar una pensión por retiro en o antes del 1 de julio de 2015 puedan recibir una pensión mayor, pero que en ningún caso excederá el 75% del sueldo más alto devengado como juez, y se elimi-naron los bonos concedidos mediante leyes especiales para todos los participantes del sistema.
Las enmiendas mantuvieron el Programa Híbrido para todas aquellas personas que sean nombradas al cargo de juez a partir del 1 de julio de 2014; es decir, a partir de esa fecha se eliminaría la posibilidad de obtener una pensión de hasta un 60% del sueldo más alto devengado como juez y se sustituiría por el Programa Híbrido.
El título solo sufrió cambios de estilo, pero mantuvo la explicación de que la ley es para efectuar cambios prospectivos al esquema legal aplicable al Sistema de Retiro de *329 futuros jueces. También se mantuvo inalterada la cláusula derogatoria que asegura que no se afectarán los derechos adquiridos y beneficios otorgados mediante otras leyes y reglamentos.(19) Además, durante todo el proceso de aprobación tampoco sufrió cambios una cláusula de separabili-dad, que dispone que “[s]i cualquier párrafo, artículo o parte de esta Ley fuera declarada inconstitucional por un tribunal con competencia y jurisdicción, la sentencia dictada no afectará ni invalidará el resto de esta Ley, y su efecto se limitará al párrafo, artículo o parte declarada inconstitucional”.(20) Sin discusión ulterior, el proyecto se refirió al Senado de Puerto Rico.
Tomamos conocimiento judicial de que el 22 de diciem-bre de 2013 la Directora Administrativa de los Tribunales, Hon. Sonia I. Vélez Colón, envió una carta al senador Hon. José R. Nadal Power, en la cual consignó su oposición a las enmiendas aprobadas por la Cámara de Representantes porque podrían violar el principio de independencia judicial. Específicamente, expresó que
[...] en la Rama Judicial somos conscientes de la necesidad de atender el déficit actuarial que enfrenta el Sistema de Retiro de la Judicatura y, cónsono con ello, valoramos el interés por identificar medidas conducentes a proveer solvencia al sistema. También reconocemos la facultad de la Asamblea Legislativa para introducir modificaciones al Sistema de Retiro de Jueces y Juezas con miras a procurar su fortalecimiento, solvencia y continuidad. Sin embargo, reiteramos que cualquier enmienda a esos fines tiene que estar enmarcada en las limitaciones que establece la Constitución como parte del sistema de frenos y contrapesos establecido para dar concreción al principio de separación de poderes.(21)
No obstante, la Directora Administrativa de los Tribu-nales exhortó a dicho cuerpo a que pospusiera la aproba- *330 ción del P. de la C. 1595 hasta que se discutiera el asunto cuidadosa y extensamente o que se revirtiera el proyecto a la versión original remitida por el Primer Ejecutivo. A esos efectos, en su comunicación indicó:
[...] hacemos un llamado a esta comisión legislativa y al Se-nado de Puerto Rico para que se abstenga de aprobar esta medida legislativa y que posponga su consideración o, en la alternativa, que la modifique para ajustarla a la normativa constitucional aplicable, conforme lo hacía la versión radicada originalmente. Como de costumbre, la Rama Judicial está disponible para participar de un diálogo sosegado y abierto que nos permita identificar alternativas cónsonas con nuestro or-denamiento constitucional.(22)
Por su parte, el Gobernador, de acuerdo con los cambios aprobados por la Cámara de Representantes en la legisla-ción propuesta por él, afirmó que sabía que habían
[...] algunas reservas con algunas enmiendas que se han he-cho en cuanto a la aplicación retroactiva de esa medida, y fue una enmienda que se hizo en la Legislatura, no estaba en el proyecto que enviamos, y eso es algo que (hay que) mirar en detalle y salvar cualquier vicio constitucional.(23)
Así las cosas, el lunes 23 de diciembre de 2013 la Comi-sión de Hacienda y Finanzas Públicas del Senado de Puerto Rico presentó su informe positivo sobre el P. de la C. 1595, recomendando su aprobación sin enmiendas. Según explica dicho informe, como parte del proceso de evaluación de esta medida legislativa, se consideraron las ponencias presentadas y resumidas anteriormente. Esta Comisión concluyó que, tanto el Programa Híbrido creado mediante el proyecto original, como las enmiendas hechas *331 en el hemiciclo, son necesarias para efectuar cambios sustanciales al Sistema de Retiro aplicable a futuros jueces.(24)
Ese 23 de diciembre, el Senado de Puerto Rico aprobó el proyecto sin enmiendas. Un día después el Gobernador lo firmó, convirtiéndolo en la Ley Núm. 162-2013. Según sus propios términos, la ley tiene vigencia inmediata, es decir, desde el 24 de diciembre de 2013.
C. Trasfondo procesal del caso
Dos días después de aprobada la ley —26 de diciembre de 2013— el Hon. Germán J. Brau Ramírez, Juez del Tribunal de Apelaciones, y la Hon. Sonia I. Vélez Colón, en su carácter de Directora de la Oficina de Administración de los Tribunales, presentaron la demanda del caso de autos contra el Estado Libre Asociado de Puerto Rico (ELA).(25) Solicitaron que se decretara la inconstitucionalidad de la Ley Núm. 162-2013 por ser contraria al Art. VI, Secs. 10 y 11 de la Constitución del Estado Libre Asociado de Puerto Rico, así como a los principios de independencia judicial y separación de poderes. Suplicó que se emitiera un injunction preliminar y permanente para prohibir su puesta en vigor.
El 30 de diciembre de 2013 la Asociación de la Judicatura presentó otra demanda, corporación cuyos miembros son jueces activos y jubilados del Tribunal de Primera Instancia y del Tribunal de Apelaciones. La Asociación peticionó que el tribunal dictara una sentencia declaratoria en la que se decretara la inconstitucionalidad de la Ley Núm. 162-2013. Argüyó que esta ley afectaba a su matrícula, compuesta por el 60% de los jueces y las juezas del Tribu *332 nal General de Justicia. También argumentó que la ley interfiere con la separación de poderes, atenta contra la cláusula del debido proceso de ley, viola la cláusula contra el menoscabo de obligaciones contractuales y disminuye los sueldos y emolumentos de los jueces y las juezas, todo esto en violación a la Constitución.
Ese mismo día, la Asociación de la Judicatura presentó una petición de certificación intrajurisdiccional ante este Tribunal. Emitimos una Resolución en la cual, tras invocar la Regla de Necesidad,(26) certificamos el pleito por tratarse de una controversia constitucional de estricto derecho y alto interés público. Al respecto, indicamos que es innega-ble que la resolución del caso puede afectar directamente los intereses de todos los jueces y todas las juezas de este Tribunal.(27) No obstante, descargamos nuestra responsabilidad y señalamos que, por más incómodo y antipático que sea, no claudicaríamos a nuestro deber constitucional de proveer a las partes demandantes un foro en el cual recla-mar sus derechos. íd. Por imperativo de esa regla, todos los jueces y todas las juezas de este Tribunal hemos participado en la consideración de este caso. En dicho dictamen, también consolidamos la petición con la demanda presentada por el Hon. Germán J. Brau Ramírez. Concedimos un término de 10 días para que las partes presentaran sus alegatos y ordenamos la celebración de una vista oral el 15 de enero de 2014.(28)
*333 Oportunamente, los demandantes —Hon. Germán J. Brau y la Asociación de la Judicatura— y los demandados —el ELA representado por la Procuradora General, Hon. Margarita Mercado Echegaray, y la Oficina de Administra-ción de los Tribunales— presentaron sus respectivos alegatos. En síntesis, el Hon. Germán J. Brau sostiene que el esquema adoptado por la Constitución del Estado Libre Asociado de Puerto Rico requiere que el Poder Judicial mantenga una posición independiente y que la situación económica de los jueces nunca sea afectada de manera retroactiva. Señala que ningún juez de este país gozaría de verdadera independencia si las Ramas Políticas de Gobierno tuvieran el poder de adoptar legislación para menoscabar su posición económica. Además, considera que la pensión es un emolumento de rango constitucional que forma parte de la compensación, por lo que esos beneficios no pueden ser reducidos de forma retroactiva para los jueces que están en funciones. Añade que la decisión del caso Dávila v. E.L.A., Civil Núm. 85-3821(904), 86 S.T.S. 65 (1986), constituye un impedimento colateral para el Estado, quien fue parte demandada con un interés similar al que podría tener en esta ocasión. Esto, pues el tribunal expresó en su sentencia que una ley que reducía de forma retroactiva los beneficios de retiro de los jueces del Tribunal Supremo, tanto incumbentes como jubilados, es inconstitucional por disminuir los beneficios y emolumentos provistos para un cargo judicial.
Por su parte, la Asociación de la Judicatura plantea que la reforma establecida en la Ley Núm. 162-2013 no tiene ningún dato o estudio actuarial que justifique las medidas. También enfoca sus argumentos en el principio de indepen-dencia judicial, el cual garantiza a la ciudadanía que los jueces y las juezas emitirán sus fallos y decisiones a base de la más correcta interpretación del Derecho, y no a base de temores o represalias. Asimismo, sostiene que un au-mento en las aportaciones de los jueces y las juezas en *334 funciones constituye una reducción de salario prohibida constitucionalmente. Añade que los participantes del Sis-tema de Retiro tienen un interés propietario de naturaleza contractual protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales. Por último, se-ñala que el Art. 4(c) de la ley contiene una clara invitación para que los jueces y las juezas que cualifiquen se retiren en o antes del 1 de julio de 2015. Esto, pues si se retiran antes de esa fecha, podrán recibir una pensión equivalente a un 75% de su sueldo, mientras que si se retiran después de esa fecha solo podrán recibir una pensión equivalente a un 60% del sueldo. Advierte que esta disposición es alta-mente preocupante, ya que establece un precedente peli-groso que permitiría a cualquier administración de turno propiciar múltiples retiros de jueces.
La Asociación de la Judicatura también nos solicita que tomemos conocimiento de unas expresiones del Goberna-dor en las que afirma que la Constitución impide que se reduzcan las compensaciones de los jueces que están en sus puestos. Además, reitera que la posición de la Asocia-ción de la Judicatura en la demanda y en su alegato es cónsona con la postura que expuso en la vista pública que se llevó a cabo sobre el P. de la C. 1595, según presentado.
Por la parte demandada, la Hon. Sonia I. Vélez Colón, en su carácter oficial como Directora Administrativa de la Oficina de Administración de los Tribunales, expresa que la reforma al Sistema de Retiro de la Judicatura de la Ley Núm. 162-2013 contraviene la Constitución, ya que au-menta la aportación individual de los jueces, reduce la pen-sión máxima a la cual pueden aspirar y elimina beneficios a los pensionados disminuyendo los sueldos y emolumen-tos de los jueces y las juezas que están en funciones. Alega que esto, a su vez, está reñido con el principio de indepen-dencia judicial. Destaca que esta postura es consecuente con la que se ha esgrimido durante todo el proceso de apro-bación del P. de la C. 1595.
*335 Por su parte, el ELA y el Secretario de Justicia, repre-sentados por la Procuradora General, exponen que la Ley Núm. 162-2013 es constitucional de su faz y constituye un medio razonable y necesario para afrontar la crisis al Sis-tema de Retiro de la Judicatura. Alegan que se colige, tanto del texto constitucional como de las discusiones de la Convención Constituyente, que la prohibición relativa a la disminución del sueldo de los jueces y las juezas no se ex-tiende a proscribir medidas como la Ley Núm. 162-2013, que enmiendan la fórmula para computar la pensión de retiro y aumentan las aportaciones individuales de los jue-ces y las juezas, a los fines de salvaguardar la existencia del sistema. Señalan que, aunque la Constitución garan-tiza un sistema de retiro, este no es inalterable. También arguyen que cualquier efecto que el aumento en las apor-taciones pueda tener en el sueldo de los jueces y las juezas es indirecto y temporero, razón por la cual no infringe la protección contra disminuciones en el sueldo de los jueces y las juezas ni atenta contra la independencia judicial. Por ello, concluyen que el estatuto no vulnera los preceptos de independencia judicial al no disminuir el sueldo bruto que por ley los jueces y las juezas tienen derecho a recibir. A su vez, alegan que la ley mantiene incólume el derecho de los y las juristas a que se mantenga un sistema de retiro.
Cabe resaltar que el ELA limita su discusión a analizar la constitucionalidad de las Sees. 2, 3 y 10 de la Ley Núm. 162-2013, por entender que esas son las disposiciones que enmiendan la fórmula de la pensión máxima de retiro y aumentan la contribución de los jueces y las juezas en funciones. En ese sentido, expresan que los demandantes no tienen legitimación activa para cuestionar las disposi-ciones de la Ley Núm. 162-2013, que solo aplicarían a los participantes que ingresarán al sistema de retiro a partir del 1 de julio de 2014.
En su escrito, el ELA defiende la aplicación de la Ley Núm. 162-2013 a los jueces y las juezas en funciones. Esto, *336 en contradicción con la postura de la Rama Ejecutiva du-rante el proceso de vistas públicas del R de la C. 1595 en su versión original. Expresan que “no estamos ante el su-puesto de una aplicación retroactiva de un estatuto, debido a que los actuales pensionados continuarán recibiendo la pensión que han recibido hasta el momento”. (Énfasis suprimido).(29) Según su discusión, “un cambio en los términos de un sistema de retiro no se puede considerar una aplicación retroactiva de la ley, excepto en los casos en que se modifique una pensión ya devengada”.(30)
Tras la presentación de los escritos, se celebró la vista argumentativa el 15 de enero de 2014. En su exposición, las partes demandantes enfatizaron la peligrosidad para la ciudadanía de permitir una violación a los principios de independencia judicial y separación de poderes. La Oficina de Administración de los Tribunales declaró sobre su posi-ción como el ente encargado de poner en vigor la reforma. Finalmente, el ELA reiteró que el sueldo de los jueces y las juezas no se afectaría porque la pensión no es parte de este.
Concluida la vista oral, el caso quedó sometido ante nuestra consideración y estamos prestos a resolver.
II
La controversia que está ante nuestra consideración amerita que analicemos varios asuntos de gran enverga-dura: la doctrina de autolimitación judicial, los principios de hermenéutica y los principios de separación de poderes e independencia judicial.
*337 A. Doctrina de autolimitación judicial y principios de her-menéutica
Como es sabido, la Rama Judicial es la encargada de interpretar y aplicar la ley. Corraliza v. Bco. Des. Eco., 153 DPR 161, 176 (2001). Esta función se encuentra limitada por la doctrina de autolimitación judicial, que tiene su génesis en consideraciones constitucionales y prudenciales. Crespo v. Cintrón, 159 DPR 290, 298 (2003); E.L.A. v. Aguayo, 80 DPR 552, 596-597 (1958). Véase, además, R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ramallo Bros. Printing, 1986, Vol. I, pág. 195. Esta doctrina busca evitar un trastoque en nuestro esquema constitucional de separación de poderes y, a su vez, permite que se mantenga el equilibrio necesario entre las Ramas de Gobierno. E.L.A. v. Aguayo, supra, págs. 597-598.
La doctrina de autolimitación judicial aplica en aquellas situaciones en las que un tribunal es llamado a evaluar la validez constitucional de una pieza legislativa. En lo pertinente, esta doctrina dispone que, cuando se cuestione la validez de una ley, aun cuando se suscite una duda seria sobre su constitucionalidad, el tribunal primero decidirá si hay una interpretación razonable que permita soslayar la cuestión constitucional. E.L.A. v. Aguayo, supra, pág. 596.
Cónsono con lo anterior, en nuestro ordenamiento jurídico las leyes se presumen constitucionales hasta tanto un tribunal competente declare lo contrario. Caquías v. Asoc. Res. Mansiones Río Piedras, 134 DPR 181, 189 (1993). Por ello, los tribunales deben esforzarse por lograr interpretaciones congruentes y compatibles que adelanten la constitucionalidad de de las leyes. Nadal v. Depto. Rec. Nat., 150 DPR 715, 720-721 (2000).(31) Asimismo, los tri *338 bunales no considerarán el aspecto constitucional de una medida legislativa cuando se pueda atender el asunto mediante un análisis estatutario. Nadal v. Depto. Rec. Nat., supra. Véase, además, P.P.D. v. Admor. Gen. de Elecciones, 111 DPR 199, 243 esc. 32 (1981). Si interpretar de forma literal un estatuto plantea cuestiones constitucionales, los tribunales, en lo posible, deberán atemperarlo para evitar que se decrete su inconstitucionalidad. Nadal v. Depto. Rec. Nat., supra, pág. 721. De igual forma, es norma reiterada que cuando se cuestiona la validez de una ley o se suscita alguna duda sobre su constitucionalidad, los tribunales deben asegurarse de que no existe otra posible interpretación razonable de la ley. Caquías v. Asoc. Res. Mansiones Río Piedras, supra, pág. 188.
Por otra parte, los principios de hermenéutica de nuestro ordenamiento sirven de base cuando los tribunales deben interpretar las leyes. Primeramente, es necesario determinar si el lenguaje de la ley es simple y preciso en relación con la controversia. S.L.G. Solá-Moreno v. Bengoa Becerra, 182 DPR 675, 691 (2011); González Hernández v. González Hernández, 181 DPR 746, 763 (2011). De ser así, los tribunales deben circunscribir su análisis a la acepción simple y clara del lenguaje, puesto que se entiende que el texto de la ley representa la intención del legislador. González Hernández v. González Hernández, supra. Véase, además, Art. 14 del Código Civil de Puerto Rico, 31 LPRA sec. 14.
No obstante, ante un lenguaje confuso, el Art. 7 del Código Civil de Puerto Rico, 31 LPRA sec. 7, asigna a los tribunales el deber de aclarar las lagunas o áreas oscu- *339 ras en la ley. Así pues, al interpretar un estatuto, hay que proveer un sentido lógico a sus diversas disposiciones y suplir posibles deficiencias cuando sea necesario. Alonso García v. S.L.G., 155 DPR 91, 99-100 (2001); Sucn. Álvarez v. Srio. de Justicia, 150 DPR 252 (2000); Pueblo v. Ferreira Morales, 147 DPR 238, 267 (1998). De surgir alguna ambigüedad en el texto del estatuto, los tribunales deben asegurarse que la interpretación cumple con los propósitos legislativos. Morales et als. v. Marengo et al., 181 DPR 852, 859 (2011). Para esto, es menester considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobar la ley. La interpretación debe atribuirle un sentido que asegure el resultado que originalmente se quiso obtener. Para ello, auscultamos la Exposición de Motivos, la cual generalmente recoge el propósito que inspiró su creación. Pueblo v. Zayas Rodríguez, 147 DPR 530, 539 (1999). En los casos en que la ley carece de una Exposición de Motivos o, cuando aun teniéndola, no contiene la inten-ción legislativa, es útil consultar otros documentos, tales como los informes de las comisiones que estudiaron el pro-yecto de ley y los debates celebrados cuando la medida fue discutida en el hemiciclo según aparecen en el Diario de Sesiones. Id. También son pertinentes los anteproyectos y los informes preparados fuera de la Asamblea Legislativa, cuando esta los tiene ante sí y los adopta sustancialmente. íd.
Además, es un principio reiterado que las leyes no han de interpretarse tomando aisladamente algunas de sus secciones, párrafos u oraciones, sino que deben serlo tomando en consideración todo su contexto. González Hernández v. González Hernández, supra, pág. 764. También, el análisis que realice el tribunal debe evitar la aplicación literal de la ley si esto tiene consecuencias absurdas; la interpretación debe ser razonable y consecuente con el propósito legislativo. Pueblo v. Mantilla, 71 DPR 36, 43-44 (1950). Por ello, si entre dos interpretaciones una es cón- *340 sona con la validez de la ley, a ella se debe ceñir la función judicial. P.S.P. v. Com. Estatal de Elecciones, 110 DPR 400, 456 esc. 2 (1980), opinión concurrente del Juez Asociado Señor Díaz Cruz. Asimismo, ante una situación de posibles conflictos de disposiciones legales, los tribunales deben, en lo posible, conciliarias para lograr un resultado lógico y razonable que represente la intención legislativa. Fernández v. Srio. de Hacienda, 122 DPR 636, 647 (1988).
En fin, “[l]os tribunales estamos autorizados a interpretar las leyes cuando, entre otras, éstas no son claras o concluyentes sobre un punto en particular; cuando el objetivo, al realizarlo, es el de suplir una laguna en la misma; o cuando, con el propósito de mitigar los efectos adversos de la aplicación de una ley a una situación en particular, la justicia así lo requiere”. (Énfasis suprimido). Pueblo v. Ortega Santiago, 125 DPR 203, 214 (1990). Según mencionado, esta función judicial está limitada por la doctrina de autolimitación judicial y por los principios de hermenéutica previamente esbozados. Más aún, como parte de la función interpretativa de la Rama Judicial, este Tribunal debe asegurarse de que las leyes cumplan con nuestro ordenamiento constitucional.
B. El retiro de los jueces y las juezas, y el derecho constitu-cional de Estados Unidos
La Constitución del Estado Libre Asociado de Puerto Rico establece un sistema republicano de gobierno basado en la doctrina de separación de poderes entre la Rama Legislativa, la Rama Ejecutiva y la Rama Judicial. Negrón Soto v. Gobernador, 110 DPR 664, 666 (1981). Ello parte de la premisa de que es necesario y saludable un equilibrio para evitar la concentración excesiva de poder en una sola Rama y mantener una democracia verdadera. Véase AAR, Ex parte, 187 DPR 835 (2013). Nuestros Constituyentes adoptaron la doctrina de separación de poderes, según desarrollada y establecida en la Constitución de Es- *341 tados Unidos. Veamos su origen y desarrollo en la jurisdic-ción federal.
La Constitución de Estados Unidos fue aprobada en 1787 y estuvo animada por cinco principios rectores, entre los cuales figuraron la división de poderes en la estructura del gobierno central, la garantía de libertades individuales y el establecimiento de un poder judicial federal que sir-viera de árbitro y garantizara esos principios. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relacio-nes constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, págs. 3-4. Sus propulsores hicieron una campaña política intensa mediante la publicación de una serie de ensayos conocidos en conjunto como “El Federalista”, en los que explicaban a la ciudadanía la necesidad de aprobar la Constitución federal. íd., pág. 4. Por consiguiente, estos documentos constituyen una fuente principal para interpretar el significado original de esa Constitución. íd. En el artículo Núm. 78 de “El Federalista”, el más influyente de esta publicación,(32) el constituyente Alexander Hamilton reconoció que el Poder Judicial es el más débil de los tres Poderes de Gobierno y explicó lo siguiente:
Whoever attentively considers the different departments of power must perceive that, in a government in which they are separated from each other, the judiciary, from the nature of it functions, will always be the least dangerous to the political right of the Constitution; because it will be least in a capacity to annoy or injure them. The Executive not only dispenses the honors but holds the sword of the community. The legislature not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society, and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL but merely judgment; and must ultimately *342 depend upon the aid of the executive arm even for the efficacy of its judgments.
This simple view of the matter suggests several important consequences. It proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks. It equally proves that though individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter; [...] And it proves, in the last place [...] that as, from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches; and that as nothing can contribute so much to its firmness and independence as permanency in office, this quality may therefore be justly regarded as an indispensable ingredient in its constitution, and, in a great measure, as the citadel of the public justice and the public security. (Enfasis suplido y nota omitida). J. Madison, A. Hamilton y J. Fay, The Federalist Papers, Nueva York, Ed. Arlington House, 1966, págs. 465-466.
Ante la vulnerabilidad de la Judicatura, los autores de la Constitución estadounidense entendieron necesario pro-veer garantías particulares a los jueces para asegurar su independencia y proteger a los ciudadanos. Nuevamente, en el artículo Núm. 79, según Hamilton:
Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. [...] In the general course of human nature, a power over a man’s subsistence amounts to a power over his will. And we can never hope to see realized in practice the complete separation of the judicial from the legislative power, in any system which leaves the forms dependent for pecuniary resources on the occasional grants of the latter. [...] The plan of the convention accordingly has provided that the judges of the United States “shall at stated times receive for their services a compensation which shall not be diminished during their continuance in office.”
[...] A man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation [...] The salaries of judicial officers may from time to time be altered, as occasion shall require, yet so as never to lessen the allow- *343 anee with which any particular judge comes into office, in respect to him. (Énfasis suplido y en el original). Íd., págs. 472-473.
A raíz de toda esta discusión, los forjadores de la Constitución federal incluyeron en la Sec. 1 del Art. Ill la llamada “cláusula de compensación”, que establece que “[l]os jueces, tanto del Tribunal Supremo como de tribunales inferiores, desempeñarán sus cargos mientras observen buena conducta y en determinadas fechas recibirán por sus servicios una compensación que no será rebajada mientras desempeñen sus cargos”. Art. III, Sec. 1, Const. EE. UU., LPRA, Tomo 1, ed. 2008, pág. 174.(33) Para encontrar una violación a esta disposición constitucional basta con que la ley en cuestión reduzca la compensación de los jueces, sin importar el propósito que haya tenido el Congreso al aprobarla. U.S. v. Hatter, 532 US 557, 577 (2001). También quedan prohibidas constitucionalmente las reducciones indirectas mediante leyes especiales, como lo sería un im-puesto contributivo que aplique solamente a los jueces. U.S. v. Hatter, supra, pág. 569; Evans v. Gore, 253 US 245, 254 (1920). Ahora bien, se permite disminuir indirectamente los sueldos de los jueces mediante una legislación de aplicación general a toda la ciudadanía, como lo sería un aumento general en las contribuciones sobre ingreso. U.S. v. Hatter, supra. Véanse, además: U.S. v. Will, 449 US 200, 226 (1980); O’Malley v. Woodrough, 307 US 277, 282 (1939).
En lo pertinente al caso que hoy atendemos, el Tribunal Supremo federal ha resuelto que la palabra “compensa-ción” incluye los salarios de los jueces y otros beneficios, como sus pensiones de retiro. Booth v. U.S., 291 US 339 (1934). Véase, además, J.J. Álvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones de los Jue- *344 ces del Tribunal Supremo: reseña de un conflicto con la independencia judicial, 56 (Núms. 2—3) Rev. Jur. UPR 265, 298 (1987). Incluso, el máximo foro federal ha determinado que el Congreso no puede reducir la pensión de los jueces federales de forma retroactiva. Booth v. U.S., supra, pág. 352.
De la misma forma, muchos tribunales estatales de Es-tados Unidos han concluido que la compensación de los jueces incluye sus pensiones y que estas no pueden redu-cirse retroactivamente. Véanse, a modo ilustrativo: Voorhees v. Sagadahoc County, 900 A.2d 733, 736-738 (Me. 2006); Lee v. State Bd. of Pension Trustees, 739 A.2d 336, 344-345 (Del. 1999); White v. Com., Employees’ Retirement System, 565 A.2d 839, 842-843 (Pa. 1989); Board of Trustees of Public Employees’ Retirement Fund v. Hill, 472 N.E.2d 204, 209 (Ind. 1985); Hudson v. Johnstone, 660 P.2d 1180, 1184-1185 (Alaska 1983); Wagoner v. Gainer, 279 S.E.2d 636, 640-643 (W.Va.1981); Marvel v. Dannemann, 490 F.Supp. 170, 176-177 (D. Del. 1980); McKenna v. Com. State Emp. Retirement Bd., 421 A.2d 1236, 1243 (Pa. 1980); Olson v. Cory, 636 P.2d 532, 539 (Cal. 1980); Betts v. Board of Administration, 582 P.2d 614, 617 (Cal. 1978); Stiftel v. Carper, 378 A.2d 124, 131 (Del. Ch. 1977), confirmado, Carper v. Stiftel, 384 A.2d 2, 57 (Del. 1977); Miles v. Tennessee Consol. Retirement System, 548 S.W.2d 299, 304-305 (Tenn. 1976); Sylvestre v. State, 214 N.W.2d 658, 666-667 (Minn. 1973).
Por ejemplo, tan reciente como en el 2012, la Corte Su-prema de Nueva Jersey resolvió lo siguiente:
No cuestionamos las buenas intenciones de la Legislatura al aprobar el Capítulo 78 [, legislación que reformaba el sistema de retiro y los beneficios de salud de los empleados públicos, entre los cuales se encontraban jueces en funciones]. No pre-sumimos que el Capítulo 78 fue aprobado en un intento por intimidar o influenciar a la Judicatura. Sin embargo, indepen-dientemente de las buenas intenciones que haya tenido la Le-gislatura al momento de aprobar el Capítulo 78, el cuál es de aplicación general a todos los empleados públicos estatales, el *345 mensaje de los constituyentes es claro. La Constitución prohíbe la reducción del salario neto de un juez durante el término de su nombramiento.
Sostenemos que el Capítulo 78, en su aplicación a los jueces en funciones al momento de su aprobación, viola el Capítulo 6, Sección 6, Párrafo 6 de la Constitución de Nueva Jersey de 1947. (Traducción y énfasis nuestros, y citas omitidas). DePascale v. State, supra, pág. 705.
C. El retiro de los jueces y las juezas, y el derecho constitucional de Puerto Rico
Con esto como trasfondo histórico, el 25 de julio de 1952 se aprobó la Constitución del Estado Libre Asociado de Puerto Rico y se adoptó el modelo federal de separación de poderes mediante el establecimiento de un sistema republicano de gobierno compuesto por un Poder Legislativo, un Poder Ejecutivo y un Poder Judicial. Art. I, Sec. 2, Const. ELA, LPRA, Tomo 1. Nuestra Ley Suprema estableció que el Poder Judicial “se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley”. Art. V, Sec. 1, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 411.
Tomando como modelo varias constituciones estatales, especialmente la de Nueva Jersey, los miembros de la Convención Constituyente incluyeron varias disposiciones para reconocer la autonomía administrativa y la independencia de la Rama Judicial, así como para adoptar las garantías concedidas por la Constitución estadounidense a los jueces federales.(34) De hecho, hemos expresado que “[l]as disposiciones del Artículo sobre la Rama Judicial fueron redactadas en forma tal que aseguraran a la comuni-dad una judicatura independiente [...]”. González v. Tribunal Superior, 75 DPR 585, 609 (1953).
A esos efectos, nuestra Ley Suprema proveyó para que *346 el número de Jueces y Juezas del Tribunal Supremo solo pueda variarse por ley a solicitud del propio Tribunal, garantizó a los Jueces y a las Juezas del Tribunal Supremo la permanencia en sus cargos mientras observen buena conducta y confirió a los demás jueces y juezas el derecho a ocupar sus puestos por términos fijos de duración aun cuando se elimine un tribunal o una sala de este. Art. V, Secs. 3, 8 y 13, Const. ELA, LPRA, Tomo 1. También estableció que los Jueces y las Juezas del Tribunal Supremo solo pueden ser destituidos por las causas y mediante el procedimiento instaurado en la Constitución, mientras que los demás jueces y juezas solo pueden destituirse por el proceso dispuesto por ley. Art. V, Sec. 11, Const. ELA, LPRA, Tomo 1. Véase González v. Tribunal Superior, supra.
De igual forma, los Constituyentes imitaron e incluyeron en nuestra Máxima Ley las protecciones concedidas por la Constitución federal a los jueces federales contra las reducciones en su compensación. González v. Tribunal Superior, supra. En particular, la Sec. 11 del Art. VI contiene la llamada “cláusula de no disminución”, la cual dispone que: “[l]os sueldos del Gobernador, de los Secretarios de Gobierno, de los miembros de la Asamblea Legislativa, del Contralor y de los Jueces se fijarán por ley especial y, con excepción del sueldo de los miembros de la Asamblea Legislativa, no podrán ser disminuidos durante el término para el cual fueron electos o nombrados”. Const. ELA, supra, pág. 436. Asimismo, 1a Sec. 10 del mismo artículo establece que “[n]inguna ley prorrogará el término de un funcionario público ni disminuirá su sueldo o emolumentos después de su elección o nombramiento”. Art. VI, Sec. 10, Const. ELA, supra, págs. 433-434.
Por otra parte, con mayor especificidad que la Constitu-ción federal, nuestra Constitución provee expresamente en su Sec. 10, Art. V, que “[l]a Asamblea Legislativa estable-cerá un sistema de retiro para los jueces, retiro que será *347 obligatorio cuando hubieren cumplido setenta años de edad”. Const. ELA, supra, pág. 417. Valga señalar que este es el único sistema gubernamental de retiro investido de rango constitucional. García Martínez v. Gobernador, 109 DPR 294, 297 (1979). Véase, además, Álvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones..., supra, págs. 297-298.
Al igual que la jurisdicción federal cuenta con “El Fede-ralista” para interpretar la Constitución estadounidense, nuestro ordenamiento cuenta con el Diario de Sesiones de la Convención Constituyente para interpretar nuestra Ley Superna, con la ventaja de que esta fue aprobada hace solo unas décadas, mientras que su homologa federal se aprobó hace más de dos siglos. Dichos documentos contienen los debates que precedieron la aprobación de nuestra Consti-tución, por lo que explican claramente el propósito de las protecciones concedidas a nuestros jueces y juezas.
En primer lugar, es de notar que inicialmente la Cons-titución contenía el término “compensación”. 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico 930-941 (2003); 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico 1974-1975 (2003). Véase Álvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones..., supra, pág. 296. Luego, por razones de estilo, se sustituyó este término por la palabra “sueldo”, pero ello no cambió el concepto de proveer a nuestros jueces y nuestras juezas las protecciones que la cláusula de com-pensación de la Constitución estadounidense garantiza a los jueces federales. Id. Sobre esto, el Prof. José J. Álvarez González nos explica:
[S]e trató meramente de un cambio lingüístico y no de un in-tento de restringir en la Constitución de Puerto Rico las con-secuencias del uso de la palabra “compensation” en la Consti-tución federal y en constituciones estatales. Como ocurre con tantas otras disposiciones constitucionales puertorriqueñas, es por lo tanto legítimo y apropiado acudir a la interpretación e historial de la Constitución federal para esclarecer el signi- *348 ficado de la nuestra. (Escolios omitidos). Alvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones..., supra, págs. 296-297.
Además de la palabra “sueldo”, los Constituyentes incluyeron en la Sec. 10 del Art. VI de nuestra Ley Suprema, supra, pág. 433, la palabra “emolumentos”, con la cual se aclaró que la protección constitucional cobija, además del sueldo, otros beneficios relacionados con el cargo del funcionario público. Sobre esta sección, el profesor Álvarez González sostiene que “[e]sta cláusula es también de entera aplicación a los jueces, como el historial de su aproba-ción por la Constituyente revela”. Álvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones..., supra, pág. 301. El proceso de aprobación de estas dos seccio-nes estuvo íntimamente ligado, por lo que deben interpre-tarse en conjunto. íd., pág. 296; J. Trías Monge, Historia constitucional de Puerto Rico, Río Piedras, Ed. UPR, 1982, Vol. III, págs. 226-227. De hecho, al discutir la facultad de la Asamblea Legislativa de disminuir su propio sueldo, contrario a la prohibición de disminuir los sueldos de los demás funcionarios públicos, disposición finalmente contenida en la Sec. 10 del Art. VI de nuestra Constitución, el delegado Luis Negrón López explicó que ello es “una protección para los funcionarios del gobierno, de manera que no puedan ser castigados por su actuación independiente. Que el poder legislativo no [...] disminuya sus sueldos como un castigo. De manera que es una protección a la independencia de los funcionarios de la rama ejecutiva y judicial”. (Énfasis suplido). 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico 928 (2003).
El Presidente de la Comisión de la Rama Judicial de la Convención Constituyente, el delegado Ernesto Ramos An-tonini, expuso ante la consideración de los Constituyentes que la eficiencia y el funcionamiento de la Rama Judicial dependerían de la independencia judicial. 1 Diario de Se-siones de la Convención Constituyente de Puerto Rico 452 *349 (2003). Explicó que la estructura de gobierno que se creó al aprobarse la Constitución estuvo inspirada en la indepen-dencia judicial, cuya función es “garantizar en nuestra vida política, social y económica un régimen de derecho a diferencia de un régimen de fuerza o de hombres”. Id. In-cluso, enumeró como una de las características que garan-tizan la independencia del poder judicial
[...] la que se refiere a la compensación de los jueces. En esta proposición se establece, categóricamente, que no se po-drá disminuir la compensación de ningún juez durante su incumbencia. No hay necesidad de explicar el alcance de esa disposición. Y asimismo se establece que la Legislatura de Puerto Rico aprobará un sistema de retiro para los jueces. Esto tiende a dar un sentido de estabilidad a los jueces en el desempeño de sus funciones, tan delicadas en nuestra sociedad. íd., pág. 453.
El delegado Leopoldo Figueroa Carreras señaló que “ [e]l juez necesita, para poder desempeñar su ministerio libremente [,] tener la garantía de la estabilidad del cargo [...]”. íd., pág. 465.
Incluso, el historial de la Asamblea Constituyente deja claro que ni siquiera una crisis presupuestaria en las arcas del Gobierno justificaría afectar la protección provista a los jueces contra la reducción de sus sueldos y emolumentos, ya que ello afectaría la independencia judicial. Veamos:
Sr. REYES DELGADO: Se me ocurre que el texto, tal como lee, pudiera interpretarse en el sentido de que en un momento de crisis no se les pudiera disminuir el sueldo a todos los fun-cionarios y empleados, lo que no sería un castigo, sino que pudiera ser necesario en cualquier momento dado. Si eso está cubierto, o si es el propósito del artículo que no se pueda dis-minuir el sueldo, independientemente de crisis o lo que hu-biere, que justificare una acción de esa naturaleza por la [Asamblea] Legislativa.
Sr. NEGRON LOPEZ: [0]bserve el compañero que esto se refiere únicamente a funcionarios y no a empleados. Los suel-dos de los empleados fluctuarán de acuerdo con las condiciones del erario público y las condiciones de la vida del país. Ahora, en cuanto a los funcionarios, es posible que surja el mal que *350 apunta el compañero, o sea que en una época de crisis no se puedan ajustar los sueldos a los valores, pero yo entiendo que podemos correr ese riesgo, en aras de la independencia, de la actuación de los funcionarios, porque yo no creo que pueda haber castigos legislativos impuestos contra los empleados por el poder legislativo; pero sí creo que los funcionarios, que son los que pueden tomar decisiones que pueden ser lesivas a lo que el poder legislativo considere su interés, por discrepancia o conflicto que puedan existir en determinado momento, ésos, que siempre serán un número mucho más limitado, deben es-tar protegidos mediante una disposición constitucional [...] (Énfasis suplido y corchetes en el original). 2 Diario de Sesio-nes de la Convención Constituyente de Puerto Rico 928 (2003).
Vemos, pues, que la protección contra la reducción de sueldos y emolumentos, así como el sistema de retiro de los jueces y las juezas son de rango constitucional y tienen como propósito asegurar la independencia judicial. Así lo hemos reconocido en Negrón Soto v. Gobernador, supra, pág. 666, y García Martínez v. Gobernador, supra, págs. 297—298. Véase, además, Rosa Resto v. Rodríguez Solís, 111 DPR 89, 94 (1981).
En cumplimiento con el mandato constitucional de la Sec. 10 del Art. V, en 1954 la Asamblea Legislativa creó el sistema de retiro de los jueces mediante la Ley Núm. 12 de 19 de octubre de 1954 (4 LPRA secs. 233-236b y 237-246). Sobre la distinción entre el sistema de retiro de los jueces y las juezas, y el resto de los sistemas de retiro que carecen de rango constitucional, la Legislatura aseguró que no se trataba de un privilegio para los jueces y las juezas, pues la independencia judicial es para proteger a los ciudadanos. Véase 4 Diario de Sesiones de la Asamblea Legislativa (Ordinaria) 2003 (1954). Véase, además, Bayrón Toro v. Serra, 119 DPR 605 (1987). De esta forma, se garantiza que a un juez no se le reduzca su compensación como represalia por una decisión tomada.
En síntesis, el establecimiento de un sistema de retiro para los jueces y las juezas, y las cláusulas de no reducción de sueldos y emolumentos fortalecen la indepen- *351 dencia judicial. Álvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones..., supra, pág. 298. Negrón Soto v. Gobernador, supra, pág. 666. Así lo expresó el re-presentante Santiago Polanco Abreu, quien sostuvo que “[u]n sistema de pensiones como el que proponemos consagrará definitivamente el principio de independencia judicial [...]”. 5 Diario de Sesiones de la Asamblea Legislativa (Extraordinaria) 150 (1954). Por nuestra parte, hemos re-conocido esta intención al expresar lo siguiente:
El propósito del Sistema de Retiro de la Judicatura es establecer un medio eficiente para proveer a los jueces retirados pensiones y otros beneficios. Se diseña un mecanismo mediante el cual los jueces del Estado Libre Asociado de Puerto Rico acu-mulan reservas para su vejez, incapacidad, separación del servicio o muerte, garantizando así la independencia del poder judicial. Debe tenerse siempre presente el propósito de la Convención Constituyente de garantizar la independencia judicial y que uno de los medios para garantizarla es el establecimiento de un sistema de retiro para los jueces, de suerte que el juez durante su gestión esté libre de preocupaciones económicas al retirarse [...] García Martínez v. Gobernador, supra, págs. 297-298.
Tres décadas después de la creación del Sistema de Retiro de la Judicatura se aprobó la Ley Núm. 17 de 24 de julio de 1985, la cual dio paso a una controversia de especial pertinencia al caso que nos ocupa. Esa ley redujo retroactivamente las pensiones de retiro de todos los jueces y las juezas incumbentes y que se habían jubilado del Tribunal Supremo. Esto originó una acción declaratoria, similar a la que hoy nos ocupa, en la que se impugnó la aplicación retroactiva de la ley. Dávila v. E.L.A., supra. El Tribunal Superior dictó una Sentencia en la que declaró inconstitu-cional la ley impugnada por violar las Secs. 10 y 11 de la Constitución, supra. El tribunal sostuvo que “[l]a Ley número 17, que redujo los beneficios de pensiones previamente conferidos a jueces retirados y a jueces incumbentes, es inconstitucional en cuanto a ellos se refiere, por disminuir los beneficios y los emolumentos provistos para *352 un cargo judicial, lo que está constitucionalmente prohibido”. Dávila v. E.L.A., supra, pág. 66. En su Sentencia, advirtió que
[...] si se acepta, como sugiere la parte demandada, que se puede por ley disminuir el derecho a pensión previamente con-cedido a los jueces en funciones, se frustraría el propósito y el motivo de la disposición constitucional porque expondría al sistema judicial, que depende enteramente de las otras ramas de gobierno para su composición y fmandamiento, a las repre-salias, presiones y a las situaciones de indebida intervención que la propia disposición constitucional quiere evitar en ga-rantía de la independencia judicial. Aunque, ciertamente, ese no aparenta ser en forma o manera alguna el motivo o el pro-pósito de la ley bajo consideración, la realidad es que, obviada toda otra consideración de sostenerse su validez se daría el potencial futuro para el logro indirecto de lo que la Constitu-ción de Puerto Rico prohíbe y trata de evitar. Id.
Inconforme, el Estado acudió ante este Tribunal. Paralelamente, el Secretario de Justicia de aquel entonces, Hon. Héctor Rivera Cruz, emitió una opinión en la que expresó que
[u]na legislación como la propuesta, atenta contra el principio de la independencia judicial y es susceptible de ser declarada inconstitucional por los tribunales. De plantearse nuevamente ante los tribunales la naturaleza de los planes de pensiones y los límites que a la acción legislativa impone la Constitución [...] podemos razonablemente anticipar que el Tribunal concluiría que el proyecto radicado adolece de graves fallas constitucionales. Op. Sec. Just. 23 de julio de 1985.
Por ello, el Estado presentó una moción de desisti-miento en la que se allanó al dictamen de inconstitu-cionalidad. Hizo referencia a la Opinión del Secretario de Justicia aquí reseñada. Además, señaló en su moción que el entonces Gobernador, Hon. Rafael Hernández Colón, ex-presó al firmar la ley impugnada que “[e]l examen del de-sarrollo de las doctrinas de derecho en cuanto a la facultad de la Asamblea Legislativa para alterar o modificar me-diante enmienda a la Ley del Sistema de Retiro de la Ju- *353 dicatura, los derechos de los participantes en dicho sis-tema, arroja dudas sobre la validez constitucional de dicha acción legislativa”.
En su moción de desistimiento, el Estado también indicó que el Primer Ejecutivo había presentado en la Asamblea Legislativa un proyecto de administración para enmendar la Ley de la Judicatura “a los fines de ajustarla a los preceptos constitucionales diseñados para garantizar la independencia judicial a la luz de lo establecido en reciente Sentencia dictada por el Tribunal Superior, Sala de San Juan en [Dávila v. E.L.A.]”. En vista de lo anterior, este Tribunal aceptó el desistimiento y ordenó el archivo definitivo y con perjuicio del recurso presentado por el Estado. Para un análisis sobre este caso, véase Alvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones..., supra.
El profesor Álvarez González analizó esa Sentencia del Tribunal Superior y describió como “encomiable” el propósito de la ley impugnada de reducir la pensión de los Jueces y las Juezas del Tribunal Supremo, debido a las condiciones económicas en que se encontraba el País. Álvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones..., supra, pág. 305. Sin embargo, señaló que “[e]l error de la Ley 17 fue su retroactividad”. Id. Además, opinó que la repercusión más evidente de lo resuelto en Dávila v. E.L.A., supra, sería que “exigirá cautela de las ramas políticas cuando estas consideren medidas que puedan tener impacto sobre la Rama Judicial. El principio de la independencia judicial ha quedado muy fortalecido tras Dávila v. E.L.A.”. Id., pág. 306. Definitivamente, esa decisión reiteró que la Constitución prohíbe a la Asamblea Legislativa reducir retroactivamente los beneficios de retiro de los jueces y las juezas. Al igual que el caso ante nos, el Estado era parte demandada en Dávila v. E.L.A., supra. Desde enton-ces, las ramas políticas han respetado esta normativa constitucional y todos los gobernadores la han observado hasta *354 la aprobación de la Ley Núm. 162-2013.(35) En este sentido, amerita destacar que en su única expresión con relación al asunto ante nuestra consideración, el Secretario de Justicia concluye que no tenía objeción a la versión original del proyecto porque aplicaría tan solo a futuros jueces y futuras juezas.
En fin, la protección contra la disminución retroactiva de los sueldos y emolumentos de los jueces y las juezas, cuyo propósito es la protección de la independencia judicial, aplica también a las pensiones de retiro y otros beneficios económicos relacionados con el cargo. Véase Alvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones..., supra, pág. 298.
I — I HH i — I
Concluida esta exposición normativa, pasemos a anali-zar los méritos de la controversia que se ha traído ante nuestra consideración. Para ello, debemos repasar la re-forma establecida mediante la Ley Núm. 162-2013. Esta ley establece dos tipos de pensión y sus disposiciones en-tran en vigor en dos fechas distintas, lo cual crea tres ca-tegorías de jueces y juezas.
En primer lugar, la reforma provee una pensión que no excederá del 60% del sueldo más alto devengado como juez para todos aquellos nombrados en o antes del 30 de junio de 2014 (Pensión 60%).(36) En segundo lugar, establece un *355 Programa Híbrido, el cual instituye una anualidad vi tali - cia que incluye un componente de beneficio definido y otro de contribución definida para todo juez o jueza nombrados por primera vez a partir del 1 de julio de 2014 (Programa Híbrido).(37) Sin embargo, las disposiciones que establecen la Pensión 60% no aclaran cuándo comienza su aplicación, pues la ley solo menciona hasta cuándo aplicará: el 30 de junio de 2014. Lo que sí surge de la ley es que, al tener vigencia inmediata, entró en vigor el 24 de diciembre de 2013. Esto tiene como efecto práctico la creación de tres categorías de jueces y juezas: (1) los jueces y las juezas nombrados a partir del 1 de julio de 2014; (2) los jueces y las juezas nombrados entre el 24 de diciembre de 2013 y el 30 de junio de 2014, y (3) los jueces y las juezas nombrados en o antes del 23 de diciembre de 2013, estén en funciones o jubilados.
Las partes demandantes alegan que la Pensión 60% aplica retroactivamente a los jueces y a las juezas en funciones y que esto contraviene lo dispuesto en nuestra Constitución. Por ello, nos invitan a decretar la inconstitucionalidad de la Ley Núm. 162-2013. No obstante, según las normas de autolimitación judicial y los principios de hermenéutica antes esbozados, tenemos la obligación de concebir una interpretación razonable de la ley, cónsona con la intención legislativa, que evite decretar la inconstitucionalidad de todo el estatuto. Para ello, debemos analizar todas sus disposiciones en conjunto, teniendo en mente que el estatuto contiene una cláusula de separabilidad.
Ante las serias deficiencias y lagunas en el texto de la referida Ley Núm. 162-2013, hemos consultado todas las fuentes del historial legislativo y ninguna señala que la intención del legislador fuera conferir un carácter retroac-tivo a la reforma del Sistema de Retiro de la Judicatura. *356 En todo caso, de la Exposición de Motivos, de las ponencias presentadas, de los informes positivos y del Diario de Se-siones surge un contundente y fundamentado apoyo al P. de la C. 1595 original por aplicar únicamente a los jueces y a las juezas nombrados por primera vez a partir del 1 de julio de 2014.
Examinado el historial legislativo, procede analizar to-das las disposiciones de la ley en conjunto para determinar cómo aplican a las tres categorías de jueces y juezas antes enumeradas. No hay duda de que el Programa Híbrido aplica prospectivamente a todos los jueces y todas las jue-zas nombrados por primera vez a partir del 1 de julio de 2014, por lo que no está en controversia su constitu-cionalidad. Asimismo, la Pensión 60% aplica a los jueces y a las juezas nombrados por primera vez entre el 24 de diciembre de 2013 y el 30 de junio de 2014, por lo que tam-poco tiene visos de inconstitucionalidad. Indiscutible-mente, tanto el Programa Híbrido como la Pensión 60% son válidas, ya que los jueces y las juezas nombrados por primera vez a partir del 24 de diciembre de 2013 entrarán al Sistema de Retiro de la Judicatura aceptando esos tér-minos y esas condiciones. En otras palabras, en lo que res-pecta a esas dos categorías de jueces y juezas, no estamos ante una disminución de sueldo o emolumentos, pues no han sido nombrados al momento de aprobarse la ley.
En cambio, a los jueces y a las juezas nombrados en o antes del 23 de diciembre de 2013 les aplica la normativa constitucional de que la pensión de un juez forma parte de su sueldo y, por tal razón, su pensión está protegida por las Secs. 10 y 11 del Art. VI de nuestra Constitución, supra. Por lo tanto, es forzoso concluir que aplicar a los jueces y a las juezas en funciones y ya jubilados la Ley Núm. 162-2013, en particular sus Secs. 1, 2, 3, 10, 12, 13, 14 y 15, representaría una disminución de sus sueldos y emolu-mentos claramente vedada por nuestro ordenamiento constitucional.
*357 Por otro lado, nótese que el título de la ley impugnada anuncia que la reforma va dirigida a “efectuar cambios prospectivos en el esquema legal aplicable al Sistema de Retiro de la Judicatura y establecer un Programa Híbrido de beneficio definido y contribución definida que habrá de resultar aplicable a futuros jueces [...]”. (Énfasis suplido).(38) Como es sabido, la Sec. 17 del Art. Ill de nues-tra Constitución exige que el título de todo proyecto de ley exprese claramente el asunto sobre el cual versa y prohíbe que la medida sea enmendada para añadir materias extrañas a lo expresado en su título.(39) Esta es otra razón por la cual, de acuerdo con las normas de autolimitación judicial y de hermenéutica, sostenemos que la Ley Núm. 162-2013 solo aplica a los jueces y a las juezas nombrados por primera vez a partir del 24 de diciembre de 2013.(40)
Asimismo, esta interpretación confiere contenido a la cláusula derogatoria de la Ley Núm. 162-2013, la cual establece que las leyes o los reglamentos contrarios a sus disposiciones quedan derogados, salvo lo que “respecta [a] los derechos adquiridos y beneficios pagaderos de acuerdo con las mismas, [Zos cuales] continuarán en vigor después de la fecha de vigencia de esta Ley”. (Énfasis suplido).(41) El legislador, mediante este inciso, protegió los derechos y be-neficios que los jueces y las juezas en funciones y jubilados ya habían adquirido al momento de la vigencia de la ley en cuestión. (42)
Por otra parte, la Ley Núm. 162-2013 incluyó una ven-tana mediante la cual los jueces y las juezas que cualifi-quen para jubilarse en o antes del 1 de julio de 2015 pue- *358 dan recibir una pension mayor a la permitida por la reforma, pero que no exceda el 75% del sueldo más alto devengado como juez.(43) Lógicamente, esta disposición solo podría aplicar a los jueces y a las juezas nombrados en o antes del 23 de diciembre de 2013, pues ningún juez nom-brado o jueza nombrada por primera vez a partir de la vigencia de la ley cualificaría para jubilarse en tan solo año y medio. Esto necesariamente conllevaría una reducción retroactiva de las pensiones de los jueces y las juezas que pudieran beneficiarse de esa ventana. Peor aún, el efecto práctico de esta disposición sería propiciar el retiro de miembros de la Judicatura de mucha experiencia, libe-rando así plazas que se podrían llenar mediante nuevos nombramientos. Precisamente, eso es lo que se busca evitar por medio de las protecciones constitucionales al sistema de retiro de los jueces y las juezas, dirigidas a garantizar la independencia judicial. Por estas razones, dicha disposición incluida en la See. 3 de la Ley Núm. 162-2013 también está vedada por nuestro ordenamiento constitucional. De esta manera, logramos imprimir un sen-tido lógico a la reforma y suplimos las deficiencias que esta presenta.
Por último, la mención que hacen las Secs. 13, 14 y 15 de la Ley Núm. 162-2013 para excluir “a los participantes del Sistema de Retiro” de los beneficios de aguinaldo de Navidad, bono de verano y bono de medicamentos, solo aplica a los jueces y a las juezas nombrados por primera vez a partir del 24 de diciembre de 2013. Una interpreta-ción contraria conllevaría una reducción retroactiva de los emolumentos de los jueces y las juezas en contra del Art. VI, Sec. 10 de la Constitución, supra. Es importante seña-lar que esta sección de la Constitución no estaba implicada *359 en Trinidad Hernández et al. v. ELA et al., 188 DPR 828 (2013). Esa realidad requiere en el caso ante nos un análi-sis diferente. Ante la aplicabilidad de la prohibición abso-luta contenida en esta sección de la Constitución y por los fundamentos expuestos, resulta innecesario abordar el planteamiento de menoscabo de obligaciones contractuales invocado por la Asociación de la Judicatura.
> HH
En resumen, hoy validamos la reforma más significativa que se ha hecho al sistema de retiro de la Judicatura desde su creación hace 60 años. Así pues, los jueces y las juezas nombrados por primera vez a partir del 1 de julio de 2014 participarán del Programa Híbrido, sujeto a las condiciones siguientes: (1) una aportación individual de 12% al Sistema de Retiro; (2) la edad mínima de retiro será 65 años; (3) un servicio mínimo como juez o jueza de 12 años para poder acogerse al retiro; (4) una anualidad vitalicia que incluya un componente de beneficio definido y otro de contribución definida a computarse utilizando como base el promedio del sueldo del juez o de la jueza en los últimos 5 años previo a su retiro;(44) (5) la eliminación del *360 bono de verano, el bono de medicamentos y el aguinaldo de Navidad concedidos mediante leyes especiales; (6) la elimi-nación de la pensión de la viuda y su sustitución por una anualidad por traspaso análoga a la de los empleados pú-blicos; (7) la reducción de la pensión por incapacidad, y (8) la cancelación de las transferencias provenientes de otros sistemas de retiro, por lo que en el cálculo de la pensión no se dará crédito por servicio alguno prestado al Gobierno en cualquier otra capacidad que no sea la de juez o jueza.
A los jueces y a las juezas nombrados por primera vez entre el 24 de diciembre de 2013 y el 30 de junio de 2014 les aplicarán las disposiciones de la Ley Núm. 162-2013 relativas a la Pensión 60%, es decir, una aportación individual de un 10% y el derecho a una pensión máxima de 60% del sueldo más alto devengado como juez o jueza. Estos jueces o juezas también tendrán derecho a recibir el resto de los beneficios concedidos por las leyes anteriores, salvo los bonos otorgados mediante legislación especial.
Los jueces y las juezas nombrados en o antes del 23 de diciembre de 2013 no sufrirán cambio alguno con respecto al derecho que tienen sobre sus pensiones de retiro. A su vez, continuarán recibiendo los beneficios concedidos mediante las leyes especiales por constituir emolumentos. Las Secs. 1, 2, 3,10,12,13,14 y 15 de la Ley Núm. 162-2013, así como cualquier parte de esta que los afecte, no aplican a los jueces y a las juezas en funciones y jubilados, en virtud de la prohibición establecida en las Secs. 10 y 11 del Art. VI de la Constitución, supra.
En conclusión, al interpretar que la Ley Núm. 162-2013 aplica a los jueces y a las juezas nombrados por primera vez a partir de su vigencia, respetamos la intención del legislador manifestada en la cláusula de separabilidad, la cual dispone que “[s]i cualquier párrafo, artículo o parte de esta Ley fuera declarada inconstitucional por un tribunal con competencia y jurisdicción, la sentencia dictada no afectará ni invalidará el resto de esta Ley, y su efecto se *361 limitará al párrafo, artículo o parte declarada inconstitucional”. (45)
Asimismo, protegemos el principio de independencia judicial que asegura al ciudadano que la adjudicación que un juez o una jueza haga de su caso, aun cuando el propio Estado sea el demandado, será imparcial y libre de las in-fluencias coercitivas de las ramas políticas. Este principio es la razón de ser de la existencia de la Rama Judicial y el baluarte en que descansa la confianza que pueda tener la ciudadanía en esta.
Con nuestro proceder, remediamos las serias inconsis-tencias señaladas de la Ley Núm. 162-2013. Solo así cum-plimos con nuestro deber de ser los últimos intérpretes de la ley, salvaguardando la deferencia merecida por el legis-lador y sin socavar el principio cardinal de la independen-cia judicial.

Se dictará Sentencia de conformidad.

 P. de la C. 1595, 17ma Asamblea Legislativa, 3ra Sesión Ordinaria de 18 de diciembre de 2013, pág. 1, según se presentó el 19 de diciembre de 2013.

 Íd., pág. 3.

 Íd., pág. 2.

 Doble vara en la extraordinaria: Intocable el retiro de los jueces en funciones, dice AGP. http://noticel.com/noticia/153203/doble-vara-en-la-extraordinaria-intocable-el-retiro-de-losjueces-en-funciones-dice-agp.html (última visita, 22 de enero de 2014).

 Las Secs. 4 y 5 del P. de la C. 1595, según presentado originalmente el 19 de diciembre de 2013, cuyo lenguaje se mantuvo inalterado y se convirtieron en la See. 3 de la Ley Núm. 162-2013, establecían la siguiente fórmula para calcular la anualidad vitalicia que recibirían los participantes del Programa Híbrido:
See. 4:
“ ‘Artículo 4-C. Cálculo de Retribución Promedio para Nuevos Participantes.— La retribución promedio de todo nuevo participante que ingrese por primera vez al Sistema después del 1 de julio de 2014, se calculará a base del promedio del sueldo del participante durante los últimos cinco (5) años de servicio. Este período de cinco (5) años será el período base.’ ”
See. 5:
“ ‘Artículo 4-D. —Anualidades para Nuevos Participantes.
“A. —Anualidad por Años de Servicios.— Los participantes que ingresen por primera vez al Sistema después del 1 de julio de 2014 y que formen parte del Programa Híbrido podrán acogerse al retiro a partir de la fecha en que cumplan sesenta y cinco (65) años de edad, hubieren completado un mínimo de doce (12) años de servicios como juez y no hubieren solicitado ni recibido el reembolso de sus aportaciones acumuladas. El importe de la anualidad será el uno punto cinco por ciento (1.5%) de la retribución promedio, multiplicado por el número de años de servicios como juez del Tribunal General de Justicia’ ”, P. de la C. 1595, supra, págs. 6-7.

 P. de la C. 1595, supra, Sec. 16, pág. 15.

 P. de la C. 1595, supra, Sec. 14, pág. 15. según presentado originalmente. Esta sección se mantuvo inalterada y se convirtió en la Sec. 18 de la Ley Núm. 162-2013.

 Ponencia de la Asociación Puertorriqueña de la Judicatura sobre el P. de la C. 1595, págs. 11-12.

 Ponencia de la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura sobre el P. de la C. 1595, pág. 5.

 Ponencia del Banco Gubernamental de Fomento sobre el P. de la C. 1595, pág. 2.

 Ponencia del Departamento de Justicia sobre el P. de la C. 1595, pág. 7.

 Íd., pág. 5.

 Íd., pág. 7. El informe de la American Bar Association al que hace referencia la Ponencia del Departamento de Justicia, 1 Standards Relating to Court Organization Sec. 1.23, pág. 60 (1990), expresa al respecto lo siguiente:
“A judicial pension system must be largely underwritten by government. It cannot very easily be established on an actuarially sound basis unless the employer (state) contribution is very high. Most actuarially sound pension systems have a sizable proportion of relatively young people in the protected group and also contemplate that a substantial number of contributors will never receive benefits, because they leave the system for other employment before becoming eligible. These conditions are reversed in judicial pension schemes, which cover a group of relatively older people, almost all of whom will remain in the system until the point of eligibility’.

 Ponencia de la Oficina de Administración de los Tribunales sobre el P. de la C. 1595, pág. 28.

 Ponencia de la Oficina de Gerencia y Presupuesto sobre el P. de la C. 1595, pág. 2.

 Las enmiendas incluidas en el entrillado incluían una sección para que, con el propósito de solventar su déficit de flujo de caja, el Sistema de Retiro solicitara un estudio actuarial para determinar el monto de la aportación adicional que el Go-bierno tendría que hacerle para evitar que el valor de los activos brutos proyectados sea, durante cualquier año fiscal subsiguiente, menor a veinte millones de dólares. La validez de esta disposición no está en controversia.

 Diario de Sesiones sobre el P. de la C. 1595 de 21 de diciembre de 2013.

 P. de la C. 1595, 17ma Asamblea Legislativa, 2da Sesión Extraordinaria de la Cámara de Representantes, 21 de diciembre de 2013, pág. 5.

 Sec. 18 de la Ley Núm. 162-2013.

 Sec. 19 de la Ley Núm. 162-2013.

 Carta de la Directora Administrativa de los Tribunales, Hon. Sonia I. Vélez Colón, al senador Hon. José R. Nadal Power de 22 de diciembre de 2013.

 Íd.

 Gobernador se distancia de objeciones al retiro de la Judicatura, http://www. elnuevodia.com/gobernadorsedistan.ciadeobjecionesalretirodelajudicatura-1674227. html (última visita, 10 de febrero de 2014).

 Informe positivo de la Comisión de Hacienda y Finanzas Públicas del Se-nado de Puerto Rico sobre el P. de la C. 1595, 17ma Asamblea Legislativa, 2da Sesión Extraordinaria, 23 de diciembre de 2013, pág. 13.

 En la demanda, el Hon. Germán J. Brau Ramírez sostiene que incluyó a la Hon. Sonia I. Vélez Colón en representación de la Oficina de Administración de los Tribunales por ser la encargada de poner en vigor las normas relacionadas con los descuentos de nómina de los jueces y las juezas para el pago de las aportaciones al sistema de retiro.

 Sobre este particular, véase la Resolución de este Tribunal de 31 de diciembre de 2013, Brau, Linares v. ELA et als., 189 DPR 1068 (2013). En una situación similar, la Corte Suprema de Nueva Jersey expresó que “ ‘[l]a regla de necesidad prohíbe la descalificación de toda la judicatura para atender un caso aun si existiera alguna percepción de que el resultado estará matizado por el interés personal.’ [...] Debemos revisar esta controversia de importancia constitucional de manera justa e imparcial. Otras cortes han hecho lo mismo. [...] No estamos haciendo nada distinto en esta ocasión”. (Traducción nuestra). DePascale v. State, 47 A.3d 690, 693 (N.J. 2012).

 Brau, Linares v. ELA et als., supra, pág. 1074.

 El 31 de diciembre de 2013, día cuando emitimos la Resolución de Brau, Linares v. ELA et als., supra, la Asociación Puertorriqueña de la Judicatura presentó una moción en auxilio de jurisdicción para que se paralizaran los efectos de la Ley Núm. 162-2013, por entender que, debido a su vigencia inmediata, el salario de los jueces y las juezas se vería afectado. Denegamos esa solicitud.

 Alegato del Estado Libre Asociado de Puerto Rico, págs. 33-34.

 Íd., pág. 34.

 Para una discusión sobre estas normas de autolimitación judicial y de hermenéutica constitucional en la jurisdicción federal, véanse: Almendarez-Torres v. *338 U.S., 523 US 224, 237-238 (1998); Public Citizen v. U.S. Dept. of Justice, 491 US 440, 465-466 (1989); Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg, and Const. Trades Council, 485 US 568, 575 (1988); U.S. ex rel. Attorney General v. Delaware & Hudson Co., 213 US 366, 407-408 (1909); Hooper v. People of State of Cal., 155 US 648, 657 (1895). Véase, además, R.H. Fallon, Jr., J.F. Manning et al., Hart and Wechsler’s, The Federal Courts and The Federal System, 6ta ed., Ed. Foundation Press, 2009, págs. 68-80.

 R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ramallo Bros. Printing, 1986, Vol. I, pág. 35.

 El texto en inglés dispone: “The judges, both of the supreme and inferior courts, shall [...] receive for their services, a compensation, which shall not be diminished during their Continuance in Office”.

 El Art. V de nuestra Constitución usó como precedente directo el Art. VI de la Constitución de Nueva Jersey y la Ley de la Judicatura de Inglaterra de 1873 a 1875. 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2610 (1961).

 Véanse los cambios realizados al Sistema de Retiro de la Judicatura anteriormente: Ley Núm. 14 de 30 de abril de 1956; Ley Núm. 103 de 26 de junio de 1957; Ley Núm. 48 de 15 de junio de 1962; Ley Núm. 78 de 25 de junio de 1964; Ley Núm. 164 de 29 de junio de 1968; Ley Núm. 71 de 25 de junio de 1969; Ley Núm. 72 de 25 de junio de 1969; Ley Núm. 21 de 26 de abril de 1972; Ley Núm. 75 de 31 de mayo de 1972; Ley Núm. 94 de 9 de junio de 1972; Ley Núm. 142 de 23 de julio de 1974; Ley Núm. 2 de 4 de Enero de 1983; Ley Núm. 17 de 24 de julio de 1985; Ley Núm. 81 de 9 de julio de 1986; Ley Núm. 20 de 8 de diciembre de 1989; Ley Núm. 21 de 8 de diciembre de 1989; Ley Núm. 66-1992; Ley Núm. 34-1993; Ley Núm. 25-1996; Ley Núm. 55-2002; Ley Núm. 548-2004; Ley Núm. 54-2007.

 También se aumenta la aportación individual al 10% pero mantiene inalterados la edad de retiro y otros beneficios.

 Para estos participantes se aumenta la aportación individual al 12%, se aumenta la edad de retiro a 65 años y se cierran las transferencias de otros sistemas de retiro, entre otras cosas.

 Ley Núm. 162-2013.

 Ninguna de las partes demandantes solicitó que declaráramos la ley incons-titucional por ser contraria a esta disposición.

 Sobre este particular, véanse: Washington Ass’n. for Substance Abuse & Violence Prevention v. State, 278 P.3d 632 (Wash. 2012); Wallace v. Ball, 88 So. 442 (Ala. 1921); McCamey v. Cummings, 172 S.W. 311 (Tenn. 1914).

 Sec. 18 de la Ley Núm. 162-2013.

 Véase Trinidad Hernández et al. v. ELA et al., 188 DPR 828 (2013).

 La parte de la See. 3 que provee esta ventana establece lo siguiente: “No obstante lo anterior, aquellos participantes que cualifiquen para solicitar una pen-sión por retiro según se dispone en este Artículo en o antes del 1ro. de julio de 2015, podrán recibir una pensión igual al setenta y cinco por ciento (75%) del sueldo más alto devengado como juez”.

 Las Secs. 4 y 5 de la Ley Núm. 162-2013 establecen la siguiente fórmula para calcular la anualidad vitalicia:
“Artículo 4-C. Cálculo de Retribución Promedio para Nuevos Participantes.— La retribución promedio de todo nuevo participante que ingrese por primera vez al Sistema a partir del 1 de julio de 2014, se calculará a base del promedio del sueldo del participante durante los últimos cinco (5) años de servicio. Este período de cinco (5) años será el período base.
........
“Artículo 4-D. — Anualidades para Nuevos Participantes.
“A. — Anualidad por Años de Servicios.— Los participantes que ingresen por primera vez al Sistema a partir del 1 de julio de 2014 y que formen parte del Pro-grama Híbrido podrán acogerse al retiro a partir de la fecha en que cumplan sesenta y cinco (65) años de edad, hayan completado un mínimo de doce (12) años de servicios como juez y no hayan solicitado ni recibido el reembolso de sus aportaciones acumuladas. El importe de la anualidad que recibirán los participantes del Pro-grama Híbrido al acogerse al retiro será el uno punto cinco por ciento (1.5%) de la retribución promedio, multiplicado por el número de años de servicios como juez del Tribunal General de Justicia. [...]”

 Sec. 19 de la Ley Núm. 162-2013.